59 P.3d 932

David K. DAVENPORT, Claimant–
Appellant,

v.

CITY AND COUNTY OF HONOLULU,
Honolulu Fire Department, Employer–
Appellee, Self–Insured.

No. 23141.

Intermediate Court of Appeals of Hawai'i.

Dec. 13, 2001.

Certiorari Granted Jan. 23, 2002.

David K. Davenport, on the briefs, claimant-appellant, pro se.

Paul K.W. Au, Deputy Corporation Counsel, on the briefs, for employer-appellee, self-insured.

BURNS, C.J., and LIM, J.; with WATANABE, J., concurring.

Opinion of the court by LIM, J.

In this workers' compensation case, Claimant Appellant David K. Davenport (Davenport) appeals, *pro se,* the January 5, 2000 amended decision and order of the Labor and

Industrial Relations Appeals Board (the Board) that affirmed in part, and modified in part, the November 21, 1996 decision of the Director of the Department of Labor and Industrial Relations, Disability Compensation Division (the Director).

The Director's decision determined, *inter alia*, that Davenport's claims of psychological injury sustained on January 14, 1994 and April 10, 1995 did not arise out of and in the course of his employment as a firefighter with the Employer–Appellee, City and County of Honolulu Fire Department (the Department), and were therefore not compensable pursuant to Hawaii Revised Statutes (HRS) § 386–3 (Supp.2000).[1] Davenport had also made a claim for a torn Achilles tendon sustained at work on May 2, 1994. The Department had accepted liability for the physiological component of that claim. The Director's decision awarded additional disability benefits for Davenport's May 2, 1994 physical injuries.

The Board affirmed the Director's denial of compensation for Davenport's January 1994 and April 1995 claims, and modified the Director's award of benefits for Davenport's May 1994 claim by adding compensation for psychological sequelae.

In doing so, the Board concluded that Davenport's January 1994 claim of psychological injury was not work-related, and hence not compensable, because it arose out of his efforts to secure a promotion at work. The Board determined that Davenport's April 1995 stress injury was not compensable because it did not occur while he was at work. We hold, with respect to the former issue,

that the Board erred as a matter of law in its interpretation and application of HRS § 386–3. We hold, with respect to the latter issue, that the Board fundamentally misapprehended the pertinent issues. We therefore vacate and remand the Board's determination of both issues. We otherwise affirm the Board's amended decision and order.

## I. BACKGROUND.

Davenport began his employment as a firefighter with the Department on January 3, 1972. On November 2, 1991, with a captain's position as his ultimate goal, Davenport took promotional examinations for placement on the lists of eligibles for Fire Fighter Level II (FF II) and Fire Fighter Level III (FF III). FF III is one step below captain. Dissatisfied with his resulting rankings, Davenport filed a February 13, 1992 petition of appeal with the City and County of Honolulu's Civil Service Commission (the CSC). Davenport requested the following remedies from the CSC: (1) disclosure of information relating to three challenged test questions, (2) clarification of the formula the City and County's Department of Personnel (Personnel Department) used to compute the scores, and (3) additional time for administrative review of the test results.

Davenport appeared before the CSC in July and November of 1993. Among the issues Davenport discussed at the hearings was the selection process, or how the Personnel Department places qualified firefighter candidates on the lists of eligibles. The Fire Chief selects candidates from the lists to fill

---

1. Hawaii Revised Statutes (HRS) § 386–3 (Supp. 2000) provides that:

 **Injuries covered.** (a) If an employee suffers personal injury either by accident arising out of and in the course of the employment or by disease proximately caused by or resulting from the nature of the employment, the employee's employer or the special compensation fund shall pay compensation to the employee or the employee's dependents as provided in this chapter.

 Accident arising out of and in the course of the employment includes the wilful act of a third person directed against an employee because of the employee's employment.

 (b) No compensation shall be allowed for an injury incurred by an employee by the employee's wilful intention to injure oneself or another

by actively engaging in any unprovoked nonwork related physical altercation other than in self defense, or by the employee's intoxication.

c) A claim for mental stress resulting solely from disciplinary action taken in good faith by the employer shall not be allowed; provided that if a collective bargaining agreement or other employment agreement specifies a different standard than good faith for disciplinary actions, the standards set in the collective bargaining agreement or other employment agreement shall be applied in lieu of the good faith standard. For purposes of this subsection, the standards set in the collective bargaining agreement or other employment agreement shall be applied in any proceeding before the department, the appellate board, and the appellate courts.

vacancies within the Department. The lists normally expire after two years. The CSC delayed ruling on Davenport's complaint and instead directed the Personnel Department to review the process to ensure that it was fair and equitable. As a result, the CSC proceedings and hearings, including a judicial review in Davenport's favor, continued for the next several years.

Meanwhile, in June 1992, Fire Chief Donald S.M. Chang (Fire Chief Chang) promoted Davenport to the position of FF II at the Kalihi Kai fire station, based on his examination score. Appointments within the Department require a six-month probationary period before they can become permanent. In October 1993, the Department again promoted Davenport, this time to a vacant permanent FF III position at the Ka'a'awa Fire Station.

Davenport did not complete his probationary period for the FF III position, because the Department rescinded his promotion on November 1, 1993 and sent him back to his former FF II assignment. Davenport claims he was "devastated." The Department took this action because several firefighters had filed a lawsuit contesting the validity of the Department's promotional examination and list of eligibles for the position of captain. In that lawsuit, the court issued a temporary restraining order (TRO) against the use of the examination for the position of captain (captain's examination). In an attempt to comply with the TRO, the Department rescinded four promotions to captain positions, along with seven promotions to FF III positions, one of which was Davenport's.

While the lawsuit over the captain's examination continued, the FF II and FF III lists, from which the Department had made the eleven rescinded promotions, were due to expire in January 1994. Davenport maintained that Fire Chief Chang had orally promised the affected firefighters that the Department would reinstate their promotions before then. However, Richard R. Seto–Mook replaced Fire Chief Chang in November 1993, and Davenport's promotion was not reinstated as purportedly promised. This forced Davenport to take new promotional examinations for the FF III list of eligibles.

Davenport was again very upset, and went on sick leave. On January 21, 1994, a doctor treated him for symptoms associated with hiatal hernia and irritable colon, and kept him off work for approximately two weeks.

Attorney Dennis W.S. Chang represented Davenport in connection with the CSC matters. He wrote a February 2, 1994 letter to the Personnel Department demanding that it immediately promote Davenport to the FF III position. Shortly thereafter, in February 1994, the Department reinstated Davenport's promotion to FF III, at the Aikahi Fire Station. The Department required Davenport to complete a new six-month probationary period, from February 16 to August 15, 1994, giving him no credit for the time he had accumulated from the previous FF III promotion.

Davenport received a probationary performance evaluation report, dated April 10, 1994, for the period February 16 to May 15, 1994. The report commented: "This is a mature, motivated employee. He has a good attitude about his work. He constantly strives to improve his performance and has good suggestions. With more experience and training he will develop into an excellent officer candidate."

However, on May 2, 1994, Davenport tore his right Achilles tendon while playing paddle tennis at the Aikahi fire station. Davenport underwent surgery on May 4, 1994 and went on sick leave. He was on total temporary disability (TTD) from May 5, 1994 through June 14, 1995. The Department accepted liability for the physiological component of Davenport's injuries.

In October 1994, Davenport began seeing a psychiatrist, Dr. Gordon J. Trockman (Dr. Trockman), for treatment of psychological problems. Dr. Trockman's reports, from the period October 1994 to August 1996, discuss in great detail Davenport's woes, including depression over his immobility from the foot injury, anger and depression over issues at work, family problems, medical problems (irritable colon and hiatal hernia), and difficulties dealing administratively with the medical system. Dr. Trockman diagnosed Davenport as having an "[a]djustment disorder with

mixed emotional features[.]" A clinical psychologist, Joseph P. Rogers, Ph.D. (Dr. Rogers), evaluated Davenport in February 1995 and explained that "[a] contributing factor to the build up of perceived stress over the years has been his dogged persistence in pursuing these [promotion and grievance] issues without compromise. This [is] characteristic of his underlying obsessive-compulsive/passive aggressive personality structure, which also plays a contributing role in the build up of perceived stress."

On December 22, 1994, Dr. Trockman filed a physician's report (WC–2 Form) of the May 2, 1994 Achilles tendon injury. His report described the injury thus: "Torn Achilles tendon physically[.] Depressed, frustrated, and upset emotionally due to additional stress, etc. [sic]." Dr. Trockman's report also mentioned a contributing cause of the injury: "Previous difficulties with Honolulu Fire Dept. administrative procedures created a background of on-going stress since 1990."

On October 25, 1994, Davenport signed a claim for workers' compensation benefits (WC 5 Form) for an injury suffered back on January 14, 1994. He described the injury as "stress, hiatal hernia, [and] irritable colon." Davenport attributed his stress injury to "a long series of administrative difficulties regarding [my] promotion over the last several years[.]" (internal quotation marks omitted). The Department had earlier filed an Employer's Report of Industrial Injury (WC–1 Form) denying the January 1994 claim "pending investigation[.]"

On April 10, 1995, while he was still off work on TTD, Davenport attended an annual health assessment for the Department conducted by the City and County Department of Health. Dr. John E. Hall diagnosed Davenport with elevated blood pressure. As a result, Davenport faced medical disqualification from his employment if he did not submit a medical report and treatment plan for the hypertension by May 27, 1995. Later, on April 8, 1996, Davenport filed a WC–5 Form for treatment of the hypertension. He referenced April 10, 1995 as the date of injury and described the injury as "stress—cumulative trauma and pain from industrial injuries." Via a WC–1 Form dated April 17, 1996, the

Department denied liability for Davenport's April 10, 1995 stress claim. In it, the Department noted: "Claimant claims hypertension due to stress claim that has been denied pending investigation."

Davenport returned for limited-duty work from June 15, 1995 until December 18, 1995. However, on December 19, 1995, Dr. Trockman declared him permanently psychiatrically disabled and incapable of working as a firefighter.

With the assistance of attorney Jeffrey M. Taylor, Davenport continued to seek workers' compensation benefits for the three psychological injuries alleged to have occurred in January 1994, May 1994 and April 1995. The Director, by a hearings officer, held a hearing on October 15, 1996 to examine Davenport's claims.

On November 21, 1996, the Director rendered a decision on Davenport's three workers' compensation claims. The Director made the following findings of fact:

> On May 2, 1994 . . ., [Davenport] was in the employ of [the Department]; on said date, [Davenport] sustained a personal injury to the back and legs by accident arising out of and in the course of employment; said injury was not caused by [Davenport's] wilful intention to injure oneself or another nor by intoxication. As a result of said injury, [Davenport] was temporarily totally disabled from work beginning May 9, 1994 through June 14, 1995, December 19, 1995 and terminating at such time as is determined by the Director that such disability has ended. As a further result, [Davenport] was temporarily partially disabled from work beginning June 15, 1995 through December 18, 1995. The matters of permanent disability and disfigurement, if any, shall be determined at a later date. The average weekly wages of [Davenport] were [$]744.93.

> On November 23, 1994 . . ., [Davenport] filed [a WC–5 Form] for a claim of injury on January 14, 1994. On March 2, 1994, [the Department] filed a [WC–1 Form] denying a claim of injury on January 14, 1994.

On April 8, 1996 ..., [Davenport] filed [a WC-5 Form] for a claim of injury on April 10, 1995. On April 24, 1996, [the Department] filed [a WC-1 Form] denying a claim of injury on April 10, 1995.

A hearing was held on October 15, 1996 to determine: 1) whether [Davenport] suffered compensable injuries on January 14, 1994 and April 10, 1995; 2) [TTD]; and 3) other issues as appropriate.

At the hearing, [Davenport] took the position that he was temporarily and totally disabled for work from December 19, 1995 through March 3, 1996 due to the May 2, 1994 injury, so he is entitled to additional TTD benefits for the period. [Davenport] stated that his TTD benefits were reinstated on March 4, 1996, when he enrolled into the vocational rehabilitation (VR) program. [Davenport] relied on Robert Simmons, M.D.'s report dated April 17, 1996.

[The Department] took the position that [Davenport] is not entitled to additional TTD benefits because he was able to perform light-duty work and it was available. [The Department] relied on Robert Smith, M.D.'s report dated May 1, 1996, and Stephen Hirasuna, M.D.'s report dated May 31, 1996.

[The Department] denied liability for the January 14, 1994 and April 10, 1995 injuries. [The Department] argued that these claims should be denied because they were due to [Davenport's] preexisting mental condition and the stress he suffered as a result of the promotion process of a firefighter. [The Department] relied on the case, *Mitchell v. Department of Educ./State of Hawaii*, AB 90-658 (Jan. 22, 1993), *appeal dismissed*, 77 H. [sic] 305 (1994). [The Department] also relied on Mark Stitham, M.D.'s [(Dr. Stitham)] report dated October 18, 1994; [Dr. Rogers'] reports dated February 27, 1995 and September 5, 1996; and Danilo Ponce, M.D.'s [(Dr. Ponce)] report dated April 27, 1996.

[Davenport] took the position that he suffered compensable injuries on January 14, 1994 and April 10, 1995. [Davenport] argued that his stress injuries were caused by the harassment from the fire chief and the telephone calls he received at home from him, and from the threats he received from the administrative officers and other coworkers. [Davenport] relied on Dr. Stitham's report dated February 27, 1995, and Dr. Rogers' report dated September 5, 1996. As an alternative position, [Davenport] argued that he suffered compensable injuries arising out of the illegal activities by [the Department] during the promotion process. [Davenport] relied on Dr. Ponce's report dated April 27, 1996. As a second alternative position, [Davenport] argued that the injuries were caused by the depression he suffered from his foot injury. [Davenport] relied on [Dr. Trockman's] report dated October 13, 1994.

Dr. Trockman attended the hearing and stated that [Davenport's] stress resulted in an irritable colon and hypertension. [Davenport's] stress was caused by the sourness and unfairness surrounding the promotion situation at work, i.e., the administrative system of the [Department]. [Davenport] reacted in physical and mental breakdown. When [Davenport] tried to fight the work conditions, he suffered total disability. Since December 19, 1995, [Davenport] has not been able to work.

In rebuttal, [the Department] argued that there is no relationship between work and [Davenport's] hypertension. [The Department] relied on [independent medical examiner] Stephen Wallach, M.D.'s [(Dr. Wallach)] report dated July 1, 1996, and John Cogan, M.D.'s [(Dr. Cogan)] report dated September 9, 1996.

After a review of the entire matter, the Director determines [Davenport] is entitled to additional TTD benefits from December 19, 1995 through March 3, 1996 for the May 2, 1994 injury. It is undisputed by the parties that [Davenport] has been participating in the VR program as of March 4, 1996. [Davenport's] enrollment into the VR program is an acknowledgment that he was temporarily and totally disabled at that time. We find no medical evidence that [Davenport's] physical condition as of March 4, 1996 was any different from the period preceding it.

We find [Davenport] did not suffer compensable injuries. It is the opinions of Drs. Stitham, Ponce, Rogers and Trockman that [Davenport's] psychiatric problems were caused not by his duties as a fireman, but from the stress of dealing with the administrative process associated with his promotion as a fireman. Even though there is a causal relationship between his injuries and the work environment, [the Board] has held psychiatric injuries arising out of personnel actions at work are noncompensable. See *Mitchell* and subsequent related cases.[2] Therefore, [the Department] is not responsible for benefits relating to the January 14, 1994 and April 10, 1995 injuries. The claims are hereby denied.

(Footnote supplied).

On November 26, 1996, Davenport appealed the Director's Decision to the Board. On April 30, 1997, the Department terminated Davenport's employment. On February 27, 1998, Jeffrey M. Taylor withdrew as attorney for Davenport. A May 14, 1998 pretrial order of the Board, issuing out of a pretrial conference attended by Davenport and counsel for the Department, identified three issues for the appeal:

a. Whether [Davenport] sustained a psychological injury on or about January 14, 1994, arising out of and in the course of employment.

b. Whether [Davenport] sustained a psychological injury as a compensable consequence of his May 2, 1994 work injury.

c. Whether [Davenport] sustained a psychological injury on or about April 10, 1995, arising out of and in the course of employment.

After a November 2, 1998 hearing at which Davenport appeared *pro se,* the Board issued its decision and order on September 30, 1999. The Board affirmed in part and modified in part the Director's decision. Specifically, the Board agreed that Davenport's January 1994

and April 1995 psychological injuries did not arise out of and in the course of employment. However, the Board found that Davenport had "sustained a psychological injury as a compensable consequence of his May 2, 1994 work injury."

On October 27, 1999, Davenport filed a motion for reconsideration with the assistance of attorney Roger C. Lerud. The motion requested that the Board reconsider its conclusions that Davenport's January 1994 and April 1995 injuries did not arise out of and in the course of his employment with the Department.

On January 5, 2000, the Board rendered an amended decision and order to "state and explain more clearly the basis for [its] conclusions." In it, the Board delivered the following relevant findings of fact:

*The January 14, 1994 injury*

. . . .

25. In [Davenport's] motion for reconsideration of our September 30, 1999 Decision and Order, [Davenport] argued that the Board misconstrued his claim for the January 14, 1994 work injury. According to [Davenport], it was never his contention that his January 14, 1994 injury was caused by the stress and frustrations of the Civil Service appeals process. [Davenport] contended that it was the failure by the new fire chief to honor his predecessor's promise that his promotion would be restored by January of 1994 that caused his stress.

Based on our review of the evidence, including the opinions of Dr. Trockman, Dr. Rogers, and Dr. Ponce, the written statements of [Davenport's] coworkers, [Davenport's] answers to [the Department's] interrogatories, the fact that [Davenport's] promotion was reinstated in February of 1994, a month after the January 14, 1994 injury date, [Davenport's] continued pursuit of his Civil Service appeal beyond that date, despite the promotion,

**2.** The Director is referring to the January 22, 1993 decision of the Board, that was later vacated by *Mitchell v. State, Dept. of Educ.,* 85 Hawai'i 250, 942 P.2d 514 (1997), in which the Hawai'i Supreme Court held that a stress-related injury arising out of disciplinary action taken in good faith by an employer arose out of and in the course of employment and was therefore compensable under HRS § 386–3. *Id.* at 257, 942 P.2d at 521.

and the fact that he continued to experience emotional problems that required him to seek psychiatric treatment in October of 1994, even though his promotion had already been restored many months before, we find that [Davenport's] January 14, 1994 psychological condition resulted from his involvement in the Civil Service administrative appeals process and not from the new fire chief's failure to honor the alleged promise of the chief's predecessor.

26. According to his work duties log for 1993 and 1994, [Davenport's] duties as a Fire Fighter included maintenance and repair work at the station, performing drills, attending classes and meetings, and sports and physical activities.

27. We find that participation in the Civil Service administrative appeals process to challenge the examination and promotion procedure is too remote from the usual and reasonable work of a firefighter to be considered an incident of [Davenport's] employment.

. . . .

### April 10, 1995 injury

33. On April 10, 1995, while he was on [TTD] for the May 2, 1994 ankle injury, [Davenport] saw Dr. John Hall, [the Department's] physician, for a physical examination to evaluate his ability to return to work.

34. [Davenport] alleged that [the Department] conducted an improper physical examination on him while he was on industrial leave and that he was threatened with medical disqualification from his job because of his work injury.

35. [Davenport] was on industrial leave on April 10, 1995, and was not at work performing his fire fighter duties or doing something incidental thereto on that date.

The Board followed with conclusions of law; in relevant part:

1. We have found that [Davenport's] January 14, 1994 psychological stress injury resulted from his involvement and par-

ticipation in the Civil Service administrative appeals process.

. . . .

In this case, [Davenport's] stress injury resulted from his participation in the Civil Service administrative process to challenge the examination and promotion procedure.

. . . .

Accordingly, we conclude that [Davenport] did not sustain a psychological injury on or about January 14, 1994, arising out of and in the course of employment.

2. We conclude that [Davenport] sustained a psychological injury as a compensable consequence of his May 2, 1994 work injury. We base our conclusion on the opinion and report of Dr. Trockman. According to Dr. Trockman, [Davenport] developed a psychological condition as a result of his difficult recovery from the ankle injury and being immobile and unable to perform at his previous physical level.

3. We conclude that [Davenport] did not sustain a psychological injury on or about April 10, 1995, arising out of and in the course of employment. [Davenport] was receiving TTD benefits for his May 2, 1994 work injury, and was not at work in April of 1995.

Davenport filed a notice of appeal of the Board's amended decision and order on February 4, 2000.

Davenport essentially argues on appeal that the Board (1) erred when it affirmed the Director's determination that the January 1994 psychological injury did not arise out of and in the course of his employment, and (2) erred when it affirmed the Director's determination that his April 1995 stress claim was not compensable because he was not at work at the time.

## II. STANDARDS OF REVIEW.

### A. Board Decisions.

 Appellate review of a decision of the Board is governed by HRS § 91–14(g) (1993).[3] *Korsak v. Hawaii Permanente Medical Group*, 94 Hawai'i 297, 302, 12 P.3d

---

3. HRS § 91–14(g) (1993) provides:
 **Judicial review of contested cases** . . . .
 . . . .

(g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings;

1238, 1243 (2000). Accordingly, it is well-established that appellate courts review the Board's findings of fact under the clearly erroneous standard. *Id.* at 302–3, 12 P.3d at 1243–44. The appellate courts decide whether a finding of fact is clearly erroneous in light of the "reliable, probative, and substantial evidence on the whole record." *Id.* at 303, 12 P.3d at 1244 (brackets and citation omitted). "The clearly erroneous standard requires the court to sustain the [Board's] findings unless the court is left with a firm and definite conviction that a mistake has been made." *Id.* (citation omitted). However, the Board's conclusions of law cannot bind an appellate court and are "freely reviewable for [their] correctness. Thus, the court reviews [conclusions of law] de novo, under the right/wrong standard." *Id.* (citation omitted).

*B. Statutory Interpretation.*

 The interpretation of a statute is a *de novo* inquiry for the appellate court. "When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.... This court may also consider the reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning." *Id.* at 303, 12 P.3d at 1244 (brackets and citations omitted).

## III. DISCUSSION.

*A. Stress injuries relating to promotions and non-disciplinary demotions, such as Davenport's January 14, 1994 claim, arise out of and in the course of employment pursuant to HRS § 386–3.*

Davenport first argues that the Board mistakenly determined that he "did not suffer

any injury on January 14, 1994, as a result of his demotion at work, effective November 3, 1993." Davenport claims the Board erroneously "based its ruling on a premise that psychogenic injuries resulting from demotions at work are somehow not compensable." These assertions underscore the basic divergence between the parties on appeal as to what, exactly, this issue is all about.

The Department contends that the Board's finding—that Davenport's January 1994 psychological injuries were caused by his efforts at promotion through the CSC appeals process-was correct and justified its conclusion that those efforts and that process were too remote an incident of employment to engender an injury "arising out of and in the course of the employment" made compensable by the terms of HRS § 386–3(a). Davenport, on the other hand, argues that the Board misapprehended his claim of injury. His January 1994 claim, he explains, was predicated instead upon the rescission of his FF III promotion, the failure of the Department to honor its alleged pledge to reinstate that promotion, and various and sundry related acts of intimidation and harassment by the Department and its personnel.

We conclude, however, that regardless of how Davenport's January 1994 claim is articulated, the Board's ultimate determination that it was not compensable was wrong as a matter of law.

HRS § 386–3(a) sets the general parameters of a compensable injury under Hawai'i's workers' compensation law:

**Injuries covered.** (a) If an employee suffers personal injury either by accident arising out of and in the course of the employment or by disease proximately caused by or resulting from the nature of

---

or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

the employment, the employee's employer or the special compensation fund shall pay compensation to the employee or the employee's dependents as provided in this chapter.

With respect to the Board's determination, we first observe that Hawai'i courts have unequivocally established that purely psychological injuries are within the contemplation of HRS § 386-3. *Royal State Nat'l Ins. v. Labor Bd.*, 53 Haw. 32, 38, 487 P.2d 278, 282 (1971) (holding that "HRS § 386-3 makes no differentiation between organic and psychic injuries arising out of the employment relationship").[4] *See also* HRS § 386-1 (1993) (" 'Disability' means loss or impairment of a physical *or mental* function." (emphasis supplied)).

▬▬▬ A covered injury is compensable if there is a "requisite nexus between the employment and the injury[,]" which nexus is "articulated in Hawai'i, as in the majority of jurisdictions, on the basis that, to be compensable, an injury must arise out of and in the course of employment." *Tate v. GTE Hawaiian Telephone Co.*, 77 Hawai'i 100, 103, 881 P.2d 1246, 1249 (1994) (footnote omitted). *See also Mitchell v. State, Dept. of Educ.*, 85 Hawai'i 250, 254, 942 P.2d 514, 518 (1997) (quoting *Tate, supra* ); *Zemis v. SCI Contractors, Inc.*, 80 Hawai'i 442, 445, 911 P.2d 77, 80 (1996) (quoting *Tate, supra* ). In this connection, we employ a " 'unitary' test that considers whether there is a sufficient work connection to bring the accident within the scope of the statute." *Zemis*, 80 Hawai'i at 445, 911 P.2d at 80, (citing *Tate, supra* ). *See also Chung v. Animal Clinic, Inc.*, 63 Haw. 642, 649, 636 P.2d 721, 726 (1981) (first formal adoption of the unitary test). To be clear, "the work connection approach simply requires the finding of a causal connection between the injury and any incidents or conditions of employment." *Tate*, 77 Hawai'i at 103, 881 P.2d at 1249 (citation omitted).

▬▬▬ Overarching this inquiry, "HRS § 386-85(1) [5] (1985) creates a statutory presumption of compensability (the presumption). The presumption imposes upon the employer the burden of going forward with the evidence and the burden of persuasion. The employer may overcome the presumption only with substantial evidence that the injury is unrelated to the employment. Evidence, to be substantial, must be credible and relevant." *Id.* at 107, 881 P.2d at 1253 (citations and original footnote omitted).

The question thus becomes whether psychological injuries engendered by non-disciplinary personnel actions—whether they be promotions, as the question here would be framed by the Department, or demotions, as it would be framed by Davenport—arise out of and in the course of the employment and hence fall within the ambit of compensability outlined by HRS § 386-3. The Board articulated the question in the former manner and answered it in the negative, finding that "participation in the [CSC] administrative appeals process to challenge the examination and promotion procedure is too remote from the usual and reasonable work of a firefighter to be considered an incident or [Davenport's] employment."

▬▬▬ As a general policy, it is "well-settled in Hawai'i that workers' compensation laws are construed liberally in favor of coverage because of its remedial character and beneficent purpose." *Mitchell*, 85 Hawai'i at 257, 942 P.2d at 521 (citation and internal quotation marks omitted). "We have traditionally construed HRS § 386-3 liberally in favor of conferring compensation because our legislature has decided that work injuries are among the costs of production which industry is required to bear." *Id.*

---

4. In *Royal State Nat'l Ins. v. Labor Bd.*, 53 Haw. 32, 487 P.2d 278 (1971), the Hawai'i Supreme Court reasoned: "The humanitarian purposes of the Workmen's Compensation Law require that indemnification be predicated not upon the label assigned to the injury received, but upon the employee's inability to work because of impairments flowing from the conditions of his employment." *Id.* at 38, 487 P.2d at 282 (citations and footnote omitted).

5. HRS § 386-85(1) (1993) provides that "[i]n any proceeding for the enforcement of a claim for compensation under this chapter it shall be presumed, in the absence of substantial evidence to the contrary: (1) That the claim is for a covered work injury[.]"

at 255, 942 P.2d at 519 (citations and internal quotation marks omitted). The "paramount purpose" of the "highly remedial" workers' compensation laws is "to provide compensation for an employee for all work-connected injuries, regardless of questions of negligence and proximate cause. Courts should therefore give them a liberal construction in order to accomplish their beneficent purposes." *Id.* at 255, 942 P.2d at 519 (citation and emphasis omitted).

▮ In light of the foregoing, we approach the issue of compensability with a general view toward coverage. A more focused examination of this issue reveals compelling support for coverage.

In *Mitchell, supra,* disciplinary action taken by Mitchell's employer caused her to suffer a stress injury. The Hawai'i Supreme Court examined the following question: "whether an employee's stress-related injury resulting from disciplinary action taken by an employer in response to an employee's misconduct is a compensable injury under HRS § 386–3 (1985)." *Id.* at 254, 942 P.2d at 518. Guiding the supreme court in its analysis were the "plain language of the statute and the legislature's intent that work-related injuries be considered as a cost of doing business." *Id.* at 257, 942 P.2d at 521 (citation omitted). As a result, the supreme court was "compelled to hold [the injury] compensible [sic] under HRS § 386–3." *Id.*

In connection with its holding, the *Mitchell* court examined workers' compensation statutes from several other jurisdictions and pointedly noted that "many jurisdictions with statutes similar to HRS chapter 386 have expressly amended them to exclude from coverage psychological or stress-related injuries resulting from good faith disciplinary actions." *Id.* For example, the supreme court cited the statutes of Alaska, Maine and Montana, that "all provide that 'a mental injury is not considered to arise out of and in the course of employment if it results from any disciplinary action ... taken in good faith by the employer.' Alaska Stat. § 23.30.265(17) (1992); Me.Rev.Stat. Ann. Tit. 39–A, § 201 (West 1993); and Mo. Ann. Stat. § 287.120 (Vernon 1994)." *Id.* (ellipsis in the original). The New York, Colorado

and New Mexico workers' compensation statutes were also cited as similar. *Id.*

The supreme court concluded that:

In the absence of an express exception in HRS § 386–3, we cannot unilaterally pronounce one. To do so would run counter to the clear import of HRS § 386–3. If the legislature should deem it advisable in the future, it can—as have the jurisdictions cited *supra*—amend HRS chapter 386 to exclude from coverage those injuries resulting from disciplinary action taken in good faith by the employer. However, unless and until the Hawai'i legislature chooses to amend HRS chapter 386, we are compelled to reach the result we have today.

*Id.*

The supreme court's message was clear. The legislature responded with alacrity and amended HRS § 386–3 in 1998. The amendment added HRS § 386–3(c), which provides, in relevant part: "A claim for mental stress resulting solely from disciplinary action taken in good faith by the employer shall not be allowed[.]"

The plain language of HRS § 386–3(c) does not exclude claims for psychological injury resulting from other types of personnel actions, such as the promotion and demotion that Davenport experienced here, not disciplinary in nature. The overall intention of the legislature confirms this facial impression. The amendment provided a "statutory mandate to prohibit any worker's compensation claim for mental stress resulting solely from disciplinary action taken in good faith by an employer." Hse. Conf. Comm. Rep. No. 162, in 1998 House Journal, at 885. Under the logic of *Mitchell,* considering the "plain language of the statute and the legislature's intent that work-related injuries be considered as a cost of doing business[,]" *Mitchell,* 85 Hawai'i at 257, 942 P.2d at 521 (citation omitted), the psychological injury arising out of the non-disciplinary promotion and demotion at issue here would appear to be compensable under HRS § 386–3.

More significant, perhaps, is the fact that the legislature had considered, but rejected, expanding the scope of the amendment to

exclude claims for stress arising out of other, non-disciplinary personnel actions. Representative Case remarked:

> The concerns relate to the restriction of this bill for now to "disciplinary actions." The House version had proposed to extend the applicability of this measure to "other personnel action" as well, and the House, in conference, in order to meet Senate concerns over the extent of "other personnel actions," offered further to define that term as "counseling, work evaluation or criticism, job transfer, layoff, demotion, suspension, termination, retirement or other action associated ordinarily with personnel administration."
>
> . . . .
>
> Yet ... the Senate conference co-chairs ... refused to accede to the House's position to extend this measure to other personnel actions as well.

Hse. Conf. Comm. Rep. No. 162, in 1998 House Journal, at 884–85. Senator Iwase also objected to the limited scope of the bill. He observed:

> But if you read the basis for the court's decision [in *Mitchell*], you would have to conclude that in jeopardy, for employers, making them liable for workers' compensation would be other personnel action taken by the employer against the employee, justifiable, good faith action taken by the employer—job demotion, job transfer, lack of pay raise, and on and on and on.
>
> And it is the law of the Mitchell case and how the court read our workers' compensation law that is at issue and which must be addressed. It was addressed in the Maine statute,[6] which is cited by the Supreme Court of the State of Hawaii in the Mitchell case. And we should pass the Maine statute, and not this one.

Sen. Stand. Comm. Rep. No. 3203, in 1998 Senate Journal, at 458 (footnote supplied).

In addition, in the process of passing the amendment, the legislature discussed examples of extant stress claims attributed to non-disciplinary personnel actions. One case in-

volved an employee who claimed for stress from disagreements with a supervisor over a job assignment. Another involved a stress claim for difficulties an employee had with a new job to which he had been promoted. Senator Iwase noted that "[b]oth fact situations would not fall under" the amendment. Sen. Conf. Comm. Rep. No. 162, in 1998 Senate Journal, at 690. He then discussed the Maine workers' compensation statute, which does shield a number of such employer actions from its coverage, and recognized that the Maine statute was not the bill the Hawai'i legislature was enacting. *Id.* at 691.

In HRS § 386-3(c), the legislature crafted a singular, limited exception to exclude from coverage "claim[s] for mental stress resulting solely from disciplinary action taken in good faith by the employer[.]" It is apparent from the legislative history of HRS § 386-3(c) that, by implication, the legislature assumes that psychological injuries engendered by other kinds of non-disciplinary personnel actions, such as promotions and demotions, arise out of and in the course of employment. More directly, "[i]n the absence of an express exception in HRS § 386-3, we cannot unilaterally pronounce one. To do so would run counter to the clear import of HRS § 386-3." *Mitchell*, 85 Hawai'i at 257, 942 P.2d at 521.

Hence, it matters not whether Davenport's January 1994 psychological injury resulted from his efforts at promotion through the CSC appeals process, as the Department would have it, or from his demotion from the FF III position and events ancillary thereto, as Davenport would have it. Once an etiological connection between non-disciplinary personnel action and psychological injury was established, it was in either event a compensable claim.

The Board in fact found that the former was the cause of Davenport's January 1994 psychological injury. Davenport appealed to the CSC issues related to the examinations he took for promotion to the positions of FF II and FF III. As the sanctioned avenue of

---

6. The Maine statute provides that "[a] mental injury is not considered to arise out of and in the course of employment if it results from any disciplinary action, work evaluation, job transfer, lay-off, demotion, termination, or any similar action, taken in good faith by the employer." Mc.Rev. Stat. Ann. Tit. 39-A, § 201 (West 2001).

redress, Davenport's CSC appeal was inextricably linked to his efforts at promotion.

The Department argued below, and argues on appeal, that the *Tate* unitary work connection test excludes Davenport's January 1994 stress claim from the coverage of HRS § 386–3. In *Tate, supra,* the Hawai'i Supreme Court explained:

> "An injury is said to arise in the course of the employment when it takes place within the period of employment, at a place where the employee reasonably may be, and while he [or she] is fulfilling his [or her] duties or engaged in doing something incidental thereto." 1 A. Larson, The Law of Workmen's Compensation § 14.00 (1993) [hereinafter Larson].
>
> Activities, such as seeking personal comfort, "going and coming," and engaging in recreation have no inherent status as part of the employment. 1A Larson § 21.81. As distinguished from actual performance of the direct duties of the job, these activities must be established as incidents of the work itself. *Id.* In explaining the method by which an activity shall be characterized as "incidental" to work, Larson writes: "[T]he word 'incident' contains an element of the usual and reasonable, both as to the needs to be satisfied and as to the means used to satisfy them." *Id.*

*Tate,* 77 Hawai'i at 103–04, 881 P.2d at 1249–50 (brackets in the original).

Following this analysis, the Department argues that the CSC appeals process did not take place in the period, at the place or in furtherance of the duties of Davenport's employment, and was therefore outside the course of his regular employment. The Department further argues that the appeal was not something incidental to Davenport's regular employment, being a "self-generated and self-controlled attempt to garner a personal benefit." Answering Brief at 22–24. The Board apparently agreed with the Department in denying Davenport compensation for his January 1994 claim, as it cited the *Tate* analysis in finding that "participation in the [CSC] administrative and appeals process is too remote from the usual and reasonable work of a firefighter to be considered as an incident of [Davenport's] employment."

On this argument, we leave to one side the query whether aspiring to advancement should, as a matter of policy, be considered an intrinsic incident of employment. We instead observe that the *Tate* analysis militates in support of the Board's determination only where, as here, the promotions grievance procedure is a formalized process conducted in all respects outside of the work milieu by a separate agency. In the many, perhaps majority, other instances in which promotions and their related grievances are settled at work, while at work, the *Tate* analysis cuts keenly in the opposite direction. We see no fair or reasoned basis for denying compensation in the former instance while bestowing it in the latter. To do so would be to decide compensability on the mere—and in this context, immaterial—serendipity of the particular administrative apparatus involved.

Because we conclude that HRS § 386–3 covers psychological injuries arising out of non-disciplinary promotions and demotions, the Board erred as a matter of law when it affirmed the Director's denial of compensation for Davenport's January 1994 injury. We vacate that part of the Board's decision and order and remand for a determination of compensation for the January 14, 1994 injury.

**B. *The Board erred in its interpretation, and thus its determination, of Davenport's April 1995 claim.***

In denying Davenport's April 1995 stress claim, the Board reasoned that Davenport "did not sustain a psychological injury on or about April 10, 1995, arising out of and in the course of employment. [Davenport] was receiving TTD for his May 2, 1994 work injury, and was not at work in April of 1995." It appears from this conclusion that the Board thought Davenport's stress injury was caused by or somehow originated from the April 10, 1995 annual health assessment he underwent on order of the Department. One of the Board's findings of fact appears to confirm our impression, as it describes Davenport's April 1995 claim as one for "psychological stress as a result of having to undergo a

medical examination on April 10, 1995, while he was on disability for the May 2, 1994 work injury."

The Board fundamentally misapprehended Davenport's April 1995 claim. Davenport's claim was for a stress injury *diagnosed* at the April 10, 1995 medical examination. The Department's physician diagnosed Davenport with hypertension during the examination and required him to furnish to the Department a medical report and treatment plan for the hypertension in order to avoid medical disqualification. Davenport's claim originally was and has always been that the hypertension was a sequela of his previous stress injuries.

On his WC–5 Form for the April 1995 injury, Davenport stated that the injury occurred due to "stress—cumulative trauma and pain from industrial injuries[,]" and that the injury was "hypertension related to stress claim that has been denied pending investigation." Davenport made the Department well aware of the basis for his April 1995 claim. In an August 27, 1997 letter to the Personnel Department, his attorney explained that "the doctors have found that the hypertension was essentially aggravated or made symptomatic by the stress. In that case likewise, because the stress is not compensable, the fact that the stress aggravated the hypertension is not compensable. Now that [*Mitchell, supra,* and a related supreme court case] have come out, clearly the hypertension is also compensable." Davenport argued this theory of compensability to the Board:

> Because the [Department] required treatment for hypertension when [Davenport] was on [i]ndustrial [l]eave for the compensable May 2, 1994 injury index claim, the hypertension treatment of April 10, 1995 should undeniably, also be compensable. As stated by [Dr. Wallach], there is no cure for [h]ypertension. [Davenport's] hypertension will require treatment for [his] entire life. The causal relationship of stress aggravating hypertension should not be disputed, especially as the [Department's] own doctor, City and County Department of Health, ordered the treatment plan. Yet on April 24, 1996, the

[Department] filed [a WC–1 Form], denying a claim of injury on April 10, 1995. Consistently, Davenport argues on appeal that his hypertension, diagnosed at the April 1995 examination, was secondary to his May 1994 stress injury.

Hence, the relevant issue with respect to Davenport's April 1995 claim was whether stress-related injuries secondary to a prior compensable injury arise in and out of the course of employment pursuant to HRS § 386–3. The Board's implicit finding that the April 10, 1995 medical examination somehow caused Davenport's hypertension was therefore clearly erroneous, because in light of the "reliable, probative, and substantial evidence on the whole record[,]" *Korsak,* 94 Hawai'i at 303, 12 P.3d at 1244 (citation and original brackets omitted), we are "left with a firm and definite conviction that a mistake has been made." *Id.* (citation omitted). Because the Board's view of Davenport's April 1995 claim was thus fundamentally skewed, it was inevitable that its conclusion—that the claim was not compensable because. Davenport was not at work on April 10, 1995—was wrong. *Id.*

The Hawai'i Supreme Court has established the proper test for determining the compensability of an injury secondary to a prior compensable injury: "Generally, 'a subsequent injury, whether an aggravation of the original injury or a new and distinct injury, is compensable if it is the direct and natural result of a compensable primary injury.' 1 A. Larson, *The Law of Worker's Compensation* § 13.11, at 3–503 (1993)." *Diaz v. Oahu Sugar Co.,* 77 Hawai'i 152, 155, 883 P.2d 73, 76 (1994).

Where the subsequent injury is the exacerbation of a preexisting condition, as appears to be the case here, "the exacerbation of a pre-existing [sic] condition that is the direct and natural result of a compensable primary injury would be a compensable subsequent injury." *Korsak,* 94 Hawai'i at 305, 12 P.3d at 1246 (citations and internal quotation marks omitted). "The test for whether a subsequent injury is a direct and natural consequence of a compensable injury is: (1) whether any causal connection exists between the original and subsequent injury;

and, if so, (2) whether the cause of the subsequent injury is attributable to some activity that would be customary in light of the claimant's condition."[7] *Id.* (citation, internal quotation marks and block quote format omitted, footnote supplied).

 In this respect, the HRS § 386-85 presumption applies: "[I]n any proceeding on a claim for compensation due to an alleged compensable consequence of a work-related injury, HRS § 386-85 creates a presumption in favor of the claimant that the subsequent injury is causally related to the primary injury." *Id.* at 307, 12 P.3d at 1248. The burden of proof to rebut the presumption of compensability of the subsequent injury is on the employer: "Hawaii's workers' compensation presumption places a heavy burden on the employer to disprove that an injury is work-related." *Id.* An employer can rebut the presumption by presenting "substantial evidence that the injury is unrelated to employment. The term 'substantial evidence' signifies a high quantum of evidence which, at the minimum, must be relevant and credible evidence of a quality and quantity sufficient to justify a conclusion by a reasonable man that an injury or death is not work connected." *Id.* (citations, italics, and some quotation marks omitted).

 There is certainly support in this record for Davenport's claim that his hypertension was exacerbated by stress as a direct and natural result of his prior compensable stress injuries. For example, Dr. Wallach opined that, although Davenport's hypertension is not related to his work as a firefighter, "[h]is chronic and acute stress may play a role." Dr. Cogan also opined that "[w]ork and other factors do not cause essential hypertension." But he added that "stressful situations can temporarily aggravate essential hypertension."

However, because of the Board's flawed focus in dealing with this issue, it failed to make any findings with respect to whether Davenport's hypertension was a direct and natural consequence of his prior compensable injuries. It failed to make any findings in relation to the evidence, the Department's burden of proof or the statutory presumption of compensability. As a result, this court has no basis whatsoever upon which to review the pertinent issues:

Under section 91-12, Hawaii Revised Statutes,[8] although each proposed finding by a party must be ruled upon, a separate ruling on each proposed finding is not indispensable. All that is required is that the agency incorporate its findings and rulings in its decision. In doing so, however, the agency must make its findings and rulings reasonably clear. The parties and the court should not be left to guess, with respect to any material question of fact, or to any group of minor matters that have cumulative significance, the precise finding of the agency.

*Freitas v. Pacific Contractors Co.*, 1 Haw. App. 77, 84-85, 613 P.2d 927, 932 (1980) (citations omitted, footnote supplied). We therefore remand the issue of the compensability of Davenport's April 10, 1995 stress claim to the Board for redetermination.

## IV. CONCLUSION.

Based on the foregoing, we vacate the Board's determination of Davenport's January 14, 1994 claim and remand for a determination of compensation. We vacate the Board's determination of Davenport's April 10, 1995 claim and remand for a redetermination of the issue of compensability. We otherwise affirm the Board's January 5, 2000 amended decision and order.

## CONCURRING OPINION BY WATANABE, J.

In light of the applicable supreme court precedent and the legislative history of Ha-

---

7. In *Korsak v. Hawaii Permanente Medical Group*, 94 Hawai'i 297, 12 P.3d 1238 (2000), the Hawai'i Supreme Court found that the exacerbation of a claimant's preexisting lower back injury, that occurred during physical therapy for a prior, compensable knee injury, was itself compensable. *Id.* at 309, 12 P.3d at 1250.

8. HRS § 91-12 (1993) provides, in relevant part, that "[e]very decision and order adverse to a party to the proceeding, rendered by an agency in a contested case, shall be in writing or stated in the record and shall be accompanied by separate findings of fact and conclusions of law."

waii Revised Statutes (HRS) § 386-3(c) (Supp.2000), I do not disagree with the majority's conclusion that the mental stress injuries suffered by Claimant Appellant David K. Davenport (Davenport) as a result of his demotion and subsequent civil service appeal to challenge his demotion are compensable. I write separately to express my concern that prior decisions embracing the unitary test for compensability under the workers' compensation law appear to have ignored the requirement in HRS § 386-3 (1993 & Supp. 2000) [1] that to be compensable, a work-related injury suffered by an employee must arise "either by *accident* arising out of and in the course of the employment or by *disease* proximately caused by or resulting from the nature of the employment [ ("occupational disease").]" (Emphases added.)

In *Royal State Nat'l Ins. Co. v. Labor & Indus. Relations Appeal Board*, 53 Haw. 32, 39, 487 P.2d 278, 282 (1971), for example, the Hawai'i Supreme Court held that an employee who suffered a mental collapse due to work pressures was entitled to workers' compensation benefits as a matter of law, even though the employer adduced evidence that the employee had not been overworked or under any unusual exertion or strain at work. The supreme court did not analyze whether an "accident" or "occupational disease" caused the employee's mental collapse but instead focused on whether the employee's mental collapse arose from the employee's working conditions. In the process, the supreme court observed as follows:

> The legislature has chosen to treat work-related injuries as a cost of production to be borne by industry and, ultimately, through the consumption process, by the community in general. In today's highly competitive world it cannot be doubted that people often succumb to mental pressures resulting from their employment. These disabilities are as much a cost of the production process as physical injuries.

The humanitarian purposes of the Work[ers'] Compensation Law require that indemnification be predicated not upon the label assigned to the injury received, but upon the employee's inability to work because of impairments flowing from the conditions of his [or her] employment. We hold, therefore, that an employee suffers a work-related injury within the meaning of HRS § 386-3 when he [or she] sustains a psychogenic disability precipitated by the circumstances of his [or her] employment. *Id.* at 38, 487 P.2d at 282 (citations and footnote omitted).

In *Wharton v. Hawaiian Elec. Co.*, 80 Hawai'i 120, 906 P.2d 127 (1995), the supreme court was called upon to determine the entitlement to workers' compensation benefits of an employee who suffered a psychological stress injury as a direct consequence of disciplinary action imposed on him for altering his time cards. The supreme court stated that the dispositive issue was whether the employee's misconduct was "outside or within the bounds of his employment duties." *Id.* at 123, 906 P.2d at 130. If the misconduct involved an "unauthorized departure from the course of employment[,]" the misconduct was outside the course of employment and noncompensable. *Id.* (quoting *Pacific Tel. & Tel. Co. v. Workers Comp. Appeals Bd.*, 112 Cal.App.3d 241, 245, 169 Cal.Rptr. 285, 288 (1980)). If, on the other hand, the misconduct involved "the performance of a duty in an unauthorized manner[,]" i.e., the "violation of regulations or prohibitions relating to the *method* of accomplishing that ultimate work[,]" the misconduct remains within the course of employment and is compensable. *Id.* (emphasis added). Holding that the employee's "misconduct ha[d] nothing to do with the work [the employee] was hired to do, i.e., maintaining and repairing electronic controls[,]" *id.* at 124, 906 P.2d at 131, the supreme court held that the employee's misconduct of

---

**1.** Hawaii Revised Statutes § 386-3(a) (Supp. 2000) provides as follows:

**Injuries covered.** (a) If an employee suffers personal injury either by accident arising out of and in the course of the employment or by disease proximately caused by or resulting from the nature of the employment, the employee's em-

ployer or the special compensation fund shall pay compensation to the employee or the employee's dependents as provided in this chapter.

Accident arising out of and in the course of the employment includes the wilful act of a third person directed against an employee because of the employee's employment.

falsifying time cards was noncompensable because it was "outside the boundaries defining his ultimate work[,]" *id.* (internal quotation marks and brackets omitted) and, therefore, was an "unauthorized departure from the course of employment" as opposed to the "performance of a duty in an unauthorized manner." *Id.* at 123, 906 P.2d at 130. As in the *Royal State* case, the supreme court did not address in *Wharton* whether the disciplinary incident that led to the employee's stress injury constituted an "accident" or "occupational disease[.]"

In *Mitchell v. Dep't of Education,* 85 Hawai'i 250, 942 P.2d 514 (1997), Mitchell, a teacher, sought review of a Labor and Industrial Relations Appeals Board (LIRAB) decision that partially denied her workers' compensation benefits for a stress-related injury she suffered as a result of disciplinary action taken against her for violating a Department of Education rule prohibiting corporal punishment against students. Vacating LIRAB's decision, the supreme court stated:

> The dispositive question is whether the conduct that gave rise to the disciplinary action is conduct within or outside the course of employment. If the conduct for which an employee is disciplined falls within the course of employment, any stress-related injury caused by a disciplinary action for such misconduct is compensable.
>
> The facts indicate that the disciplinary action was prompted by Mitchell's alleged use of corporal punishment during class. Whether Mitchell in fact administered corporal punishment is not essential to the determination of compensability because misconduct, even if willful, does not necessarily preclude workers' compensation recovery. Instead, we must determine whether Mitchell's alleged conduct, wrongful or otherwise, was related or incident to her duties as a teacher and, therefore, "in the course of employment."
>
> Here, the incident occurred during school hours, in the classroom, and in an attempt to maintain order and discipline. As the classroom teacher, when [a student] became unruly, it became incumbent upon Mitchell to act in order to prevent further loss of control. In other words, Mitchell

was performing her duty as a teacher to maintain classroom control. Even assuming, *arguendo,* that she did indeed effectuate this purpose by striking [the student], she was nonetheless performing a duty of her employment, albeit in an unauthorized manner. This is precisely the type of misconduct that is considered to be within the scope of employment under *Wharton.*

> . . . .

> Accordingly, we hold that, even if Mitchell administered corporal punishment in violation of the work-rule prohibiting such conduct, thus warranting discipline, she nevertheless sustained a compensable injury because she was acting within the course of her employment at the time of the alleged misconduct.

*Id.* at 256, 942 P.2d at 520 (citations and footnotes omitted). The supreme court did not consider whether the disciplinary action in *Mitchell* constituted an "accident" or "occupational disease[.]"

In this case, while Davenport's stress injuries may have resulted from his work-related demotion and civil service appeal, I do not believe that such activities constituted an "accident" or "occupational disease" under HRS § 386–3(a). Therefore, were it not for the supreme court case law that appears to have eliminated the "accident" or "occupational disease" statutory requirement for compensability and focused only on whether an injury was work-related, I would affirm that part of LIRAB's decision that concluded that Davenport's January 1994 claim for injuries arising out of his efforts to secure a promotion at work were not compensable.