**Electronically Filed
Supreme Court
SCWC-19-0000077
24-DEC-2020
11:25 AM
Dkt. 13 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---oOo---

_____

SCWC-16-0000663

KENNETH M. SKAHAN,
Petitioner/Claimant-Appellant/Appellant,

vs.

STUTTS CONSTRUCTION COMPANY, INC.,
Respondent/Employer-Cross-Appellant/Appellee,
and

FIRST INSURANCE COMPANY OF HAWAII, LTD.,
Respondent/Insurance Carrier-Cross-Appellant/Appellee.

(CASE NO.: AB 2014-019 (WH); DCD NO.: 9-04-45072(M))

SCWC-16-0000664

KENNETH M. SKAHAN,
Petitioner/Claimant-Appellant,

vs.

STUTTS CONSTRUCTION COMPANY, INC.,
Respondent/Employer-Appellee,

and

FIRST INSURANCE COMPANY OF HAWAII, LTD.,
Respondent/Insurance Carrier-Appellee.

(CASE NO.: AB 2014-041 (WH); DCD NO.: 9-13-45106(M))
_____

SCWC-19-0000077

KENNETH M. SKAHAN,
Petitioner/Claimant-Appellant,

vs.

STUTTS CONSTRUCTION COMPANY, INC.,
Respondent/Employer-Appellee,

and

FIRST INSURANCE COMPANY OF HAWAII, LTD.,
Respondent/Insurance Carrier-Appellee.

(CASE NO.: AB 2015-374 (M); DCD NO.: 7-14-45105)
_____

SCWC-19-0000077

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-16-0000663; CAAP-16-0000664; and CAAP-19-0000077)

DECEMBER 24, 2020

RECKTENWALD, C.J., NAKAYAMA, McKENNA, AND WILSON, JJ., AND
CIRCUIT JUDGE JOHNSON, IN PLACE OF POLLACK, J., RECUSED

OPINION OF THE COURT BY McKENNA, J.

## I.    Introduction

These consolidated cases arise from pro se litigant Kenneth Skahan's ("Skahan") claims for workers' compensation benefits against his former employer, Stutts Construction Company ("Stutts"), and its insurance carrier, First Insurance Company of Hawai'i (collectively with Stutts, "Employer").

On November 30, 2004, Skahan injured his back while working for Stutts, and Stutts accepted workers' compensation liability for the injury.  On June 12, 2012, after Skahan's employment with Stutts had ended, Skahan experienced mid and low back pain while wading in the ocean.  Skahan was subsequently diagnosed with Diffuse Idiopathic Skeletal Hyperostosis ("DISH")[1] affecting his thoracic spine, and he filed multiple claims for additional workers' compensation benefits against Employer.

The Labor and Industrial Relations Appeals Board ("LIRAB") issued three decisions.  On June 17, 2016, LIRAB determined Skahan's DISH injury was compensable because it was causally related to the November 30, 2004 work injury, but his low back injury was not compensable because it was not causally related to the November 30, 2004 work injury.  On June 21, 2016, LIRAB determined the dates for which Skahan was entitled to temporary total disability ("TTD") benefits.  In a January 3, 2019 decision, LIRAB again stated that Skahan's DISH injury was related to his November 30, 2004 work injury.[2]

---

[1]    "DISH" is a condition involving the "bony hardening of ligaments in areas where they attach to your spine" and may or may not cause symptoms. Diffuse Idiopathic Skeletal Hyperostosis (DISH), Mayo Clinic, https://perma.cc/ZUL6-UJFZ (last visited June 24, 2020).

[2]    As LIRAB's January 3, 2019 decision reiterated its findings and determinations from earlier decisions, this opinion does not further discuss the January 3, 2019 decision.

Skahan appealed all three LIRAB decisions.  The Intermediate Court of Appeals ("ICA") consolidated and addressed Skahan's appeals of LIRAB's June 21, 2016 and January 3, 2019 decisions in a summary disposition order ("SDO"), and it addressed Skahan's appeal of LIRAB's June 17, 2016 decision in a separate SDO.  Ultimately, the ICA affirmed all three LIRAB decisions.  We accepted and have consolidated Skahan's applications for writ of certiorari from both SDOs, and we rule as follows.

The ICA erred in holding that Employer rebutted the Hawai'i Revised Statutes ("HRS") § 386-85 (2015) presumption that Skahan's low back claim was for a covered work injury.  In addition, LIRAB's finding that Skahan's injury was "permanent and stationary and at maximum medical improvement" by April 19, 2013 is clearly erroneous, and LIRAB's COL ending Skahan's TTD benefits on April 19, 2013 is also clearly erroneous as it is not supported by the record.  The additional issues raised by Skahan on certiorari are without merit.[3]

---

[3]    With respect to LIRAB's June 17, 2016 decision, those issues are:
   (1)   Did the ICA err by failing to apply the right/wrong standard of review to LIRAB's conclusions of law?
   (2)   Did the ICA err in determining that the issue of whether his DISH injury was causally related to the November 2004 work injury was moot?

With respect to LIRAB's June 21, 2016 and January 3, 2019 decisions, those additional issues are:
   (1)   Was LIRAB required to explain how granting Employer's motion for stay of payments would comply with HRS
                                              (continued . . .)

4

We therefore vacate the ICA's May 19, 2020 judgment on appeal affirming LIRAB's June 17, 2016 decision and also vacate in part the ICA's May 27, 2020 judgment on appeal affirming LIRAB's June 21, 2016 and January 3, 2019 decisions and we remand to LIRAB for further proceedings consistent with this opinion.

## II. Background

### A. Factual background

On November 30, 2004, Skahan injured his back while working for Stutts, and Employer accepted liability for the injury. Skahan was treated by doctor Lora Aller ("Dr. Aller"), who diagnosed him with a chest and thoracic spine strain and opined that Skahan was temporarily disabled from working. Dr. Aller released Skahan to return to work on August 8, 2005. Employer ended Skahan's TTD benefits on October 4, 2005, and Skahan requested a hearing with the Department of Labor and Industrial Relations Disability Compensation Division ("DCD"). On January 6, 2006, DCD issued its decision determining that the termination of TTD was proper. DCD left the matters of

---

(. . . continued)

§ 91-14(c)?
(2) Did the ICA fail to apply the proper standards of review to LIRAB's COLs and application of HRS § 386-3(a)?
(3) Did LIRAB err in concluding he was not permanently and totally disabled?

5

permanent disability and disfigurement to be determined at a later date.  Skahan did not appeal.

On June 12, 2012, Skahan experienced pain in his back while wading in the ocean.  Skahan no longer worked for Stutts at the time of the injury.  In a June 27, 2012 letter to First Insurance, Skahan stated that he had reinjured his back and asked to change physicians because Dr. Aller had left the state.  The letter claimed the "date of injury" was November 30, 2004, but it did not explain how Skahan had injured his back.  Skahan asked First Insurance to "respond quickly as [he was] in a great deal of pain and [was] having difficulty breathing."  First Insurance did not respond.

On July 3, 2012, Skahan filed a claim for workers' compensation against Employer listing the date of accident as November 30, 2004 and seeking to reopen his prior claim.  In an August 16, 2012 letter to First Insurance, Skahan stated that this was "not a new injury," but an aggravation of the November 30, 2004 work injury.  In a September 12, 2012 letter to DCD, Skahan further explained that he had been unable to see a doctor because they did not take workers' compensation patients or would not see him without the insurer's approval, First Insurance had not allowed him to change physicians, and he could not afford to see a physician without insurance.

Skahan was eventually treated by Dr. Capen and saw him on an almost monthly basis beginning on November 16, 2012. Dr. Capen's November 16, 2012 initial physician's report diagnosed Skahan with a thoracic spine strain. Dr. Capen's December 28, 2012 report described Skahan's June 12, 2012 injury as an aggravation or recurrence of his November 30, 2004 injury. In an April 19, 2013 report, Dr. Capen concluded that Skahan was "never going back to doing heavy work." Dr. Capen connected Skahan's low back injury to the November 30, 2004 injury.

At Employer's request, Skahan was also evaluated by doctor Lorne Direnfeld ("Dr. Direnfeld"). In his July 19, 2013 report, Dr. Direnfeld opined that Skahan suffered from DISH, the November 30, 2004 accident had caused his DISH to become symptomatic, and the June 12, 2012 injury "may represent a non-work related symptomatic aggravation" of his DISH. Dr. Direnfeld disagreed with Dr. Capen's opinion that Skahan's low back injury was caused by the November 30, 2004 work accident, as no investigation of Skahan's lumbar spine had been required in relation to the November 30, 2004 work accident and Skahan had suffered a low back injury before the November 30, 2004 work accident. Dr. Direnfeld noted that Skahan himself attributed his low back problems to a previous 1994 injury.

7

B.   **Procedural background related to Skahan's first application for certiorari**

   1.   **DCD proceedings**

On August 19, 2013, Skahan filed a claim for workers' compensation against Employer describing his injury as an occupational disease affecting his low and mid back and "a preexisting [a]symptomatic condition which was first evident in 2004," and stating that the "date of accident" was April 7, 2013.[4]  The claim also stated that Skahan had filed for DISH injury benefits, and that his DISH was causally related to the November 30, 2004 injury.

On January 10, 2014, DCD issued its decision denying Skahan's August 19, 2013 claim.  DCD found that Skahan was not employed by Stutts on April 7, 2013 and did not suffer injuries "arising out of and in the course of employment" under HRS §§ 386-3 (2015)[5] and 386-85.[6]  Skahan appealed DCD's decision to

---

[4]   Although the August 19, 2013 claim listed the "date of accident" as April 7, 2013, Skahan's opening brief and his first application referred to the June 12, 2012 injury.

[5]   HRS § 386-3(a) provides:

> If an employee suffers personal injury either by accident arising out of and in the course of the employment or by disease proximately caused by or resulting from the nature of the employment, the employee's employer or the special compensation fund shall pay compensation to the employee or the employee's dependents as provided in this chapter.
>
> Accident arising out of and in the course of the employment includes the wilful act of a third person directed against an employee because of the employee's employment.

8

LIRAB.

## 2.    LIRAB proceedings

On June 17, 2016, LIRAB issued its decision reversing in part DCD's January 10, 2014 decision.  LIRAB credited Dr. Direnfeld's opinion that Skahan's thoracic spine symptoms were due to DISH, his DISH became symptomatic as a result of the November 30, 2004 incident, and his DISH was attributable to his work for Stutts.  While DCD had construed Skahan's August 19, 2013 claim as a claim for new injury, LIRAB found that Skahan's claim was actually a "claim for DISH that was causally related to the November 30, 2004 work accident," and that his DISH claim should be decided under his November 30, 2004 injury claim.  LIRAB concluded that Employer failed to rebut the presumption that Skahan's DISH was a covered work injury.

However, LIRAB also found that Employer had presented evidence from Dr. Direnfeld that Skahan's low back injury was not related to the November 30, 2004 injury, and Dr. Capen did not provide an opinion connecting Skahan's low back injury to the November 30, 2004 work injury.  LIRAB determined that, therefore, Employer met its burdens of production and persuasion to show that Skahan's low back condition was not causally

_____

(. . . continued)
[6]    HRS § 386-85 provides, in relevant part: "In any proceeding for the enforcement of a claim for compensation under this chapter it shall be presumed, in the absence of substantial evidence to the contrary: (1) That the claim is for a covered work injury[.]"

related to the November 30, 2004 injury, and it denied his low back claim.

On July 11, 2016, Skahan filed a motion for reconsideration, which LIRAB also denied.  Skahan appealed LIRAB's June 17, 2016 decision and order denying motion for reconsideration to the ICA.

### 3.    ICA proceedings

Skahan raised various points of error challenging nearly all of LIRAB's June 17, 2016 findings of fact ("FOFs") and conclusions of law ("COLs").  The relevant point of error is Skahan's claim that Employer did not meet its burden of production regarding his low back condition because Dr. Direnfeld's opinion did not address whether the November 30, 2004 work injury could have aggravated or accelerated his condition.

On April 1, 2020, the ICA issued its SDO affirming LIRAB's decision.  Skahan v. Stutts Construction Co. (Skahan I), CAAP-16-0000664 (App. April 1, 2020) (SDO).  In relevant part, the ICA addressed Skahan's argument that Employer failed to show his low back injury was not causally related to the November 30, 2004 work injury.  Skahan I, SDO at 5.  The ICA noted that, under HRS § 386-85, there is a presumption that a claim is for a covered work injury, and it is the employer's burden to introduce substantial evidence to rebut the presumption.  Id. (citing Panoke v. Reef Dev. of Hawaii, Inc., 136 Hawai'i 448, 461,

10

363 P.3d 296, 309 (2015)).  According to the ICA, Dr. Direnfeld's July 19, 2013 report stated Skahan's low back injury was unrelated to the November 30, 2004 injury.  Skahan I, SDO at 5-6.  Furthermore, the ICA stated that "nothing in Dr. Capen's reports produced in this record provide[d] any opinion or medical basis to relate Skahan's lower back injury to the November 30, 2004 incident."  Skahan I, SDO at 6.  The ICA held that LIRAB therefore did not err in concluding that Employer rebutted the HRS § 386-85 presumption.  Skahan I, SDO at 7.

### 4.  Application for certiorari

In relevant part, Skahan maintains his low back injury was causally connected to his previous work-related injuries, and that LIRAB misapplied HRS §§ 386-3(a) and 386-85 by concluding that his "low back injury was not [a] work-related [injury.]"

### C.  Procedural background related to Skahan's second application for certiorari

### 1.  DCD proceedings

On July 2, 2013, Skahan filed a workers' compensation claim for permanent total disability as a result of the November 30, 2004 injury, as aggravated by the June 12, 2012 injury.

On January 15, 2014, DCD issued a supplemental decision on whether Skahan was entitled to vocational rehabilitation ("VR") services and whether he was temporarily disabled and the period of temporary disability.  DCD found that Skahan's November 30,

2004 work injury resulted in his DISH becoming symptomatic, and the June 12, 2012 injury was a non-work-related aggravation of his DISH condition. DCD did not credit Dr. Capen's certification of disability beginning November 16, 2012. DCD also concluded that Skahan was entitled to VR services and TTD benefits beginning August 8, 2013 through October 15, 2013. Skahan appealed DCD's decision to LIRAB, and Employer filed a cross-appeal.

### 2. LIRAB proceedings

On June 21, 2016, LIRAB issued its decision affirming in part, reversing in part, and modifying DCD's January 15, 2014 supplemental decision.

LIRAB's FOFs included the following. Skahan's DISH was causally related to his November 30, 2004 injury, the June 12, 2012 ocean injury aggravated Skahan's DISH, and his benefits should be determined under the November 30, 2004 claim. There was no medical evidence to support a finding of TTD between June 12, 2012 and November 15, 2012. Based on Dr. Capen's reports, Skahan was temporarily and totally disabled from November 16, 2012 through April 19, 2013, and Skahan's condition was "permanent and stationary" by April 19, 2013. Based on Dr. Capen's reports, Skahan was unable to return to carpentry work as a result of the November 30, 2004 work injury. Skahan self-referred for VR on August 8, 2013.

LIRAB's COLs included the following. The June 12, 2012 injury was a direct and natural result of the November 30, 2004 work injury and did not terminate Employer's liability. Skahan was entitled to TTD benefits from November 16, 2012 to April 19, 2013, while enrolled in VR from August 8, 2013 through October 15, 2013, and for any periods thereafter while enrolled in VR.

LIRAB therefore affirmed in part, reversed in part, and modified DCD's January 15, 2014 supplemental decision. Skahan appealed LIRAB's June 21, 2016 decision to the ICA.

3.    ICA proceedings

Skahan raised 46 points of error challenging most of the FOFs and COLs in LIRAB's June 21, 2016 decision. The relevant point of error to this appeal was that Skahan should have been awarded TTD from June 12, 2012 to November 15, 2012, and TTD should not have been terminated on April 19, 2013.

On April 29, 2020, the ICA issued its SDO affirming LIRAB's decisions. Skahan v. Stutts Construction Co. (Skahan II), CAAP-16-0000663/CAAP-19-0000077 (App. April 29, 2020) (SDO). The ICA addressed Skahan's challenge to LIRAB's June 21, 2016 FOFs, including LIRAB's finding that Skahan was entitled to TTD benefits from November 16, 2012 through April 19, 2013 and while enrolled in VR from August 8, 2013 through October 15, 2013. After reviewing the record, the ICA was "not left with a definite or firm conviction that a mistake [had] been made."

13

Skahan II, SDO at 11.  The ICA also held that LIRAB's COLs were supported by its FOFs and reflected an application of the correct rule of law.  Skahan II, SDO at 12.  The ICA affirmed LIRAB's June 21, 2016 decision and January 3, 2019 decision. Skahan II, SDO at 14-15.

### 4.    Application for certiorari

In relevant part, Skahan argues the ICA erred in affirming LIRAB's termination of TTD benefits on April 19, 2013 and in denying TTD benefits from June 12, 2012 through November 15, 2012.  Skahan asserts the DCD director did not terminate his TTD benefits as required under HRS § 386-31(b), and that there was no legal ground to terminate TTD because he was not "able to resume work" as defined by HRS § 386-1.

### III. Standard of Review

### A.    LIRAB decisions

"Appellate review of a LIRAB decision is governed by HRS § 91-14(g)[.]"  Igawa v. Koa House Rest., 97 Hawai'i 402, 405-06, 38 P.3d 570, 573-74 (2001).  "[I]t is well-established that appellate courts review [LIRAB's] findings of fact under the clearly erroneous standard."  Davenport v. City and Cty. of Honolulu, 100 Hawai'i 297, 305, 59 P.3d 932, 940 (App. 2001). "However, [LIRAB's] conclusions of law cannot bind an appellate court and are 'freely reviewable for [their] correctness.  Thus, the court reviews [conclusions of law] de novo, under the

14

right/wrong standard.'" Id. (quoting Korsak v. Hawaii Permanente Medical Group, 94 Hawai'i 297, 303, 12 P.3d 1238, 1244 (2000)).

## IV. Discussion

**A. Employer did not rebut the presumption that Skahan's low back injury was work-related**

### 1. Employer did not meet its burden of production

Skahan argues LIRAB misapplied HRS § 386-85 in determining that his low back injury was not work related. HRS § 386-85(1) provides: "In any proceeding for the enforcement of a claim for compensation under this chapter it shall be presumed, in the absence of substantial evidence to the contrary . . . [t]hat the claim is for a covered work injury[.]" "The statute nowhere requires . . . some preliminary showing that the injury occurred 'in the course of employment' before the presumption will be triggered." Chung v. Animal Clinic, Inc., 63 Haw. 642, 650, 636 P.2d 721, 727 (1981). "[T]o rebut the presumption, the employer has the burden of going forward with the evidence, which is the burden of production, as well as the burden of persuasion." Panoke, 136 Hawai'i at 461, 363 P.3d at 309.

"The burden of production means that 'the employer must initially introduce substantial evidence that, if true, could rebut the presumption that the injury is work-related.'" Id. (quoting Nakamura v. State, 98 Hawai'i 263, 267, 47 P.3d 730, 734

15

(2002)). "'[S]ubstantial evidence' means 'a high quantum of evidence which, at the minimum, must be relevant and credible evidence of a quality and quantity sufficient to justify a conclusion by a reasonable [person] that an injury or death is not work connected.'" 136 Hawai'i at 462, 363 P.3d at 310 (quoting Nakamura, 98 Hawai'i at 267-68, 47 P.3d at 734-35). "In evaluating whether the burden of producing substantial evidence has been met, 'the slightest aggravation or acceleration of an injury by the employment activity mandates compensation.'" 136 Hawai'i at 461, 363 P.3d at 309 (quoting Van Ness v. State of Hawai'i, Dept. of Educ., 131 Hawai'i 545, 562, 319 P.3d 464, 481 (2014)).

The ICA held that Employer met its burdens of production and persuasion to show the low back injury was not causally related to the November 30, 2004 injury through: Dr. Direnfeld's report noting that the medical records for the November 30, 2004 injury did not reference a low back condition; Dr. Direnfeld's opinion that the low back injury was not related to the November 30, 2004 injury; evidence of Skahan's 1990s low back injury sustained under a different employer; and Dr. Capen's lack of opinion that Skahan's low back injury was related to the November 30, 2004 injury. Skahan I, SDO at 5-6.

Dr. Direnfeld's report is similar to the doctors' reports in Panoke. Panoke initially claimed to have injured his back as

16

the result of a work injury.  Panoke, 136 Hawai'i at 450, 363 P.3d at 298.  The next month, Panoke also reported shoulder pain. 136 Hawai'i at 451, 363 P.3d at 299.  Panoke had previously fractured both shoulders in a motor vehicle accident over a decade earlier.  136 Hawai'i at 452, 363 P.3d at 300.

At trial before LIRAB, the employer presented doctors' opinions that Panoke had not initially reported shoulder pain, his shoulder injury was not related to the work accident, and "more likely than not" the work accident did not cause or aggravate Panoke's prior shoulder injury.  136 Hawai'i at 453-54, 363 P.3d at 301-02.  Two doctors opined that Panoke would have likely experienced immediate pain if his shoulder injuries were related to the work injury.  136 Hawai'i at 453, 455-56, 363 P.3d at 301, 303-04.  One doctor also testified that Panoke's shoulder injuries were inconsistent with the work accident.  136 Hawai'i at 463, 363 P.3d at 311.  In contrast, Panoke's treating physician opined that his shoulder injuries were related to the work accident and that he had "fully and totally recovered" from the motor vehicle accident.  Id.  LIRAB denied Panoke's shoulder injury claim.  136 Hawai'i at 458, 363 P.3d at 306.

On certiorari, we held that the employer had not presented substantial evidence sufficient to overcome the presumption that Panoke's shoulder injury was work-related.  136 Hawai'i at 461,

17

363 P.3d at 309.  We held that "generalized" testimony that there was no connection between an injury and work without further explanation does not rebut the presumption of coverage, and "the primary focus of the medical testimony should have been a discussion on whether the employment effort, whether great or little, in any way aggravated [the employee's condition.]"  136 Hawaiʻi at 462, 363 P.3d at 310 (emphasis added).  Regarding Panoke's history of shoulder injuries, we stated that "evidence showing why Panoke's [work] accident could not have aggravated these conditions was necessary for the employer to adduce 'substantial evidence' and overcome the presumption of coverage."  136 Hawaiʻi at 463, 363 P.3d at 311 (emphases added).

We noted that the employer's medical experts testified that the work accident could not have caused Panoke's shoulder injury without adequately explaining whether the accident aggravated his existing injury.  136 Hawaiʻi at 463, 363 P.3d at 311.  While two doctors opined that the work accident had probably not aggravated Panoke's shoulder injury because he would have likely experienced immediate shoulder pain if it had, we noted "there is nothing in the record to explain why Panoke would have started experiencing serious shoulder pain approximately two weeks after the work accident if the work accident had not caused the injury or aggravated some pre-existing injury."  136 Hawaiʻi at 463-64, 363 P.3d at 311-12.  Therefore, the employer

18

did not adduce substantial evidence because its experts merely "opine[d] generally that Panoke had an injury predating his employment[.]" 136 Hawai'i at 464, 363 P.3d at 312. (internal brackets and quotation marks omitted).

In this case, Dr. Direnfeld's report was even more generalized than the doctors' reports in Panoke. Like the doctors in Panoke, Dr. Direnfeld did not focus on whether Skahan's 1994 low back injury could have been aggravated or accelerated by the November 30, 2004 accident. Instead, Dr. Direnfeld opined that the low back injury was not caused by or related to the November 30, 2004 accident without explaining how he reached this conclusion. Dr. Direnfeld's report also stated that the medical record for the November 30, 2004 accident did not reference a low back injury, implying that Skahan would have reported low back pain if the November 30, 2004 accident had caused or aggravated his low back injury. However, unlike the doctors in Panoke, Dr. Direnfeld did not actually explain how the November 30, 2004 accident was inconsistent with a low back injury, or whether Skahan would have experienced immediate pain if the accident had aggravated his low back condition. Nor did Dr. Direnfeld's report explain whether the November 30, 2004 accident could have aggravated Skahan's low back injury so as to make it more susceptible to reinjury. See Panoke, 136 Hawai'i at 463, 363 P.3d at 311.

19

Therefore, Employer did not meet its burden of production to show that Skahan's low back injury was not causally related to the November 30, 2004 work injury.

### 2. LIRAB's FOF 34 is clearly erroneous

We additionally note that LIRAB's FOF 34, finding that "[o]n this record, Dr. Capen did not provide any opinions or medical basis to relate [Skahan's] lumbar spine condition to the November 30, 2004 work injury," is clearly erroneous. Dr. Direnfeld's report referenced and responded to Dr. Capen's opinion that Skahan's low back injury was related to the November 30, 2004 incident. For instance, Dr. Direnfeld's report stated that he disagreed with Dr. Capen's opinion that Skahan's lumbar disc protrusion was caused by the November 30, 2004 work accident. Dr. Direnfeld's report also noted that Dr. Capen opined in an April 19, 2013 report that Skahan's injuries were "due to the thoracic spine injury and the L4-5 disc injury, both of which occurred in 2004." (Emphasis added.) While Dr. Capen's April 19, 2013 report was not included in the record for the CAAP-16-0000664 proceedings, it was part of the record in the related CAAP-16-0000663/CAAP-19-000077 proceedings.

Therefore, the record shows that Dr. Capen opined that Skahan's low back injury was related to the November 30, 2004 injury. However, in FOF 35, LIRAB determined that Employer met its burden of persuasion because there was no evidence that

20

Skahan's low back injury was related to the November 30, 2004 work injury. While we need not reach whether Employer met its burden of persuasion because it did not meet its burden of production, we note that LIRAB did not properly weigh Employer's evidence against all of Skahan's evidence.

We therefore vacate the ICA's May 19, 2020 judgment on appeal affirming LIRAB's June 17, 2016 decision.[7]

## B.   Determination of TTD benefits

### 1.   Termination of TTD on April 19, 2013

Skahan argues the ICA erred in affirming LIRAB's termination of TTD benefits on April 19, 2013. Skahan asserts that the DCD director did not terminate his TTD benefits as required under HRS § 386-31(b) and that there was no medical opinion that he was able to resume work.

HRS § 386-31 provides in part that TTD benefits "shall only be terminated upon order of the director or if the employee is able to resume work." HRS § 386-1 defines "able to resume work" as meaning the worker has stabilized and "is capable of performing work in an occupation for which the worker has

---

[7]     With respect to LIRAB's June 17, 2016 decision, Skahan also argues that the ICA failed to apply the right/wrong standard of review to LIRAB's COLs. However, it appears the ICA did apply the right/wrong standard of review.
     Skahan relatedly argues that the ICA erred in determining that the issue of whether his DISH injury was causally related to the November 30, 2004 work injury was moot because the right/wrong standard of review applied. However, "[m]ootness is an issue of subject matter jurisdiction," not of the standard of review. State v. Nakanelua, 134 Hawaiʻi 489, 501, 345 P.3d 155, 167 (2015). Therefore, Skahan's arguments are without merit.

received previous training or for which the worker has demonstrated aptitude." (Emphases added.) "[I]f an employee is capable of performing work in an occupation for which the worker has received previous training or for which the worker has demonstrated aptitude, [they are] not totally disabled." Tamashiro v. Control Specialist, Inc., 97 Hawai'i 86, 92, 34 P.3d 16, 22 (2001) (internal quotation marks omitted).

In its January 15, 2014 decision, DCD determined that Skahan was entitled to TTD benefits from August 8, 2013 through October 15, 2013 and while Skahan remained enrolled in VR. On appeal, LIRAB awarded additional TTD between November 16, 2012 and April 19, 2013. Therefore, although Skahan argues the DCD director did not terminate his TTD benefits on April 19, 2013, DCD had not actually awarded TTD benefits between November 16, 2012 and April 19, 2013 in the first place.

As to LIRAB's termination of TTD benefits, in its June 21, 2016 decision LIRAB credited Dr. Capen's October 18, 2013 report ostensibly stating that Skahan was totally disabled from work from November 16, 2012 and was "permanent and stationary and at maximum medical improvement" by April 19, 2013. Therefore, LIRAB concluded that Skahan "was entitled to TTD benefits from November 16, 2012 to April 19, 2013[.]" LIRAB did not award TTD between April 19, 2013 and August 8, 2013. However, LIRAB affirmed DCD's award of TTD benefits "while [Skahan] was

22

enrolled in VR from August 8, 2013 through October 15, 2013, and for any periods thereafter while enrolled in VR."

Contrary to LIRAB's findings, Dr. Capen's October 18, 2013 report did not actually state that Skahan's condition was permanent, stationary, and at maximum medical improvement on April 19, 2013. Dr. Capen's October 18, 2013 report actually stated, "I previously rated the patient as permanent and stationary and having reached Maximum Medical Improvement," but it did not specify when he made this assessment. (Emphasis added.) Neither did Dr. Capen's April 19, 2013 report state that Skahan was permanent and stationary and at maximum medical improvement. After reviewing the record, it appears that the first time Dr. Capen opined that Skahan was "permanent and stationary" was in an August 23, 2013 report.

Even assuming Dr. Capen determined that Skahan was at maximum medical improvement by April 19, 2013, his report from that date opined that Skahan was "never going back to doing heavy work." While LIRAB found Skahan's condition was permanent and stationary, it also found that he "was unable to return to his usual and customary work as a carpenter as a result of the November 30, 2004 work injury." See HRS § 386-31; HRS § 386-1; Tamashiro, 97 Hawai'i at 92, 34 P.3d at 22. This finding suggests that Skahan was not actually "able to return to work" between April 19, 2013 and August 8, 2013. Furthermore, LIRAB

23

did not explain why Skahan was entitled to TTD benefits as of August 8, 2013, but not during the almost three months between April 19, 2013 and August 8, 2013.

Therefore, LIRAB's finding that Skahan was "permanent and stationary and at maximum medical improvement" by April 19, 2013 is clearly erroneous, and LIRAB's COL 3 stating that Skahan had "returned to pre-June 12, 2012 aggravation status by April 19, 2013" and was therefore entitled to TTD benefits from November 16, 2012 through April 19, 2013 and while he was enrolled in VR from August 8, 2013 through October 15, 2013 is not supported by the record.

2. **TTD benefits from June 12, 2012 through November 15, 2012**

Skahan asserts that LIRAB also erred in denying TTD benefits from June 12, 2012 through November 15, 2012.  While Skahan's application does not provide further argument, one of his opening briefs argued that nothing precluded awarding him TTD from June 12, 2012 to November 15, 2012 despite the lack of medical evidence, citing Panoke, 136 Hawai'i 448, 363 P.3d 296.

In Panoke, the claimant promptly received medical treatment for his work injuries.  136 Hawai'i at 451, 363 P.3d at 299.  LIRAB denied TTD benefits for certain periods based on the lack of a physician's statement of certification that Panoke was temporarily and totally disabled, and it did not credit

24

physicians' reports stating Panoke was significantly impaired because they did not state that the impairment was due to a work injury. 136 Hawaiʻi at 464, 363 P.3d at 312. On certiorari, we held that "LIRAB may not deny a claimant benefits based on deficiencies in a physician's certifications of disability." 136 Hawaiʻi at 465, 363 P.3d at 313. While HRS § 386-96 (Supp. 2005)[8] required physicians to include the dates of disability in their reports, it did not provide that claimants' benefits must be denied due to a physician's non-compliance. 136 Hawaiʻi at 466, 363 P.3d at 314. We acknowledged that "nothing in [HRS § 386-31(b)[9]] prescribes a particular method of proof" of TTD, and that "LIRAB must assess the quality of the evidence that is presented, to determine whether the necessary showing has been made." Id.

The facts of this case differ from Panoke, where the claimant received prompt medical treatment and medical records existed for the disputed TTD period. 136 Hawaiʻi at 451, 363

---

[8]     HRS § 386-96(a)(2) required physicians treating injured employees to include in their reports the "dates of disability." HRS § 386-96(b) provided: "No claim under this chapter for medical treatment . . . shall be valid and enforceable unless the reports are made as provided in this section[.]"

[9]     HRS § 386-31(b) provides in part: "The employer shall pay temporary total disability benefits promptly as they accrue to the person entitled thereto without waiting for a decision from the director, unless this right is controverted by the employer in the employer's initial report of industrial injury." HRS § 386-31(b) does not provide any particular method of proof of total temporary disability.

25

P.3d at 299.  Skahan did not receive medical care for the June 12, 2012 injury until November 16, 2012.  Additionally, while LIRAB's COL 3 relied on the lack of medical certification of disability in denying TTD benefits in this case,[10] LIRAB's FOF 39 specifically determined that there was "no medical evidence to support a finding of TTD" from June 12, 2012 to November 15, 2012.  LIRAB's COL 3 also referenced the existence of medical records in awarding TTD from November 16, 2012 through April 19, 2013.  Therefore, it appears that LIRAB based its denial of TTD from June 12, 2012 to November 15, 2012 on the lack of any medical evidence in the record, not just the lack of certifications of disability.

---

[10]   LIRAB's COL 3 read:

> Claimant worked sporadically after being released to work in 2005, but he stopped working altogether in 2009 after a heart attack and heart surgery in 2006.  Claimant did not seek medical treatment for the November 30, 2004 work injury between 2005 and June 2012.
> There is no medical certification of disability resulting from the November 30, 2004 work injury for the period of June 12, 2012 to November 15, 2012.
> Based on medical certification of disability from Dr. Capen, the medical records documenting Claimant's office visits with Dr. Capen for the periods of November 16, 2012 through April 19, 2013, and the Board's findings that Claimant was stable and permanent and returned to pre-June 12, 2012 aggravation status by April 19, 2013, the Board concludes that Claimant was entitled to TTD benefits from November 16, 2012 to April 19, 2013, as a result of the June 12, 2012 aggravation of his November 30, 2004 thoracic spine injury.
> Pursuant to HRS § 386-25, the Board further concludes that Claimant is entitled to TTD benefits while he was enrolled in VR from August 8, 2013 through October 15, 2013, and for any periods thereafter while enrolled in VR.

(Emphasis added.)

26

However, we stated in Panoke that "nothing in [HRS § 386-31(b)] prescribes a particular method of proof" of TTD. 136 Hawai'i at 466, 363 P.3d at 314. It is not clear in this case that LIRAB considered the non-medical evidence in the record in declining to award TTD for this period. For instance, LIRAB's FOF 24 found that Skahan sent a June 27, 2012 letter to First Insurance seeking medical treatment due to the reinjury of his back, requesting a change of physician, and stating that he "was in a great deal of pain and having difficulty breathing." LIRAB's COLs did not discuss this finding.

We have stated that "LIRAB must assess the quality of the evidence that is presented, to determine whether the necessary showing [of TTD] has been made." Id. Considering the broad humanitarian purpose of our workers' compensation statutes, this assessment should include non-medical evidence. See DeFries v. Ass'n of Owners, 999 Wilder, 57 Haw. 296, 303, 555 P.2d 855, 860 (1976). However, it is possible that even if LIRAB considered the non-medical evidence, it would have nevertheless determined that Skahan failed to make a necessary showing of TTD from June 12, 2012 through November 15, 2012. LIRAB should clarify its determination of this issue on remand.

27

We therefore vacate in part the ICA's May 27, 2020 judgment on appeal affirming LIRAB's June 21, 2016 and January 3, 2019 decisions.[11]

### V. Conclusion

We vacate in part the ICA's May 27, 2020 judgment on appeal affirming LIRAB's June 21, 2016 and January 3, 2019 decisions, and we vacate the ICA's May 19, 2020 judgment on appeal affirming LIRAB's June 17, 2016 decision.  We remand to LIRAB for further proceedings consistent with this opinion.

| | |
|---|---|
| Kenneth M. Skahan, Pro se | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Beverly S.K. Tom and Gary N. Kunihiro, for Respondents | /s/ Sabrina S. McKenna |
| | /s/ Michael D. Wilson |
| | /s/ Ronald G. Johnson |



---

[11]     With respect to LIRAB's June 21, 2016 and January 3, 2019 decisions, Skahan's application additionally argues LIRAB was required to explain how Employer's motion for stay of payments complied with HRS § 91-14(c).  However, HRS § 91-14 applies to judicial courts, not LIRAB.

Skahan argues the ICA failed to apply the proper standard of review because it determined that LIRAB's challenged COLs were mixed questions of law and fact.  However, many of LIRAB's COLs incorporated its FOFs and actually presented mixed questions of law and fact.

Skahan also argues LIRAB erred in concluding he was not permanently and totally disabled under the odd-lot doctrine.  "Under the odd-lot doctrine, an injured employee may be considered permanently and totally disabled if [they are] unable to obtain employment because of work-related permanent partial disability combined with such factors as age, education, and work experience."  Bumanglag v. Oahu Sugar Co., 78 Hawai'i 275, 281, 892 P.2d 468, 474 (1995).  LIRAB's June 21, 2016 decision discussed Skahan's age, the extent of his impairment, and his eligibility for VR services in finding that he was not permanently totally disabled under the odd lot doctrine.  After reviewing the record, LIRAB's determination was not clearly erroneous.

Therefore, Skahan's arguments are without merit.